NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

ANGEL B., OSANNA B., *Appellants,*

*v.*

DEPARTMENT OF CHILD SAFETY, A.B., R.B., *Appellees.*

No. 1 CA-JV 15-0419
FILED 8-25-2016

Appeal from the Superior Court in Maricopa County
No.  JD509273
The Honorable David King Udall, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Tucson
By Dawn Rachelle Williams
*Counsel for Appellees*

Gates Law Firm LLC, Buckeye
By S. Marie Gates
*Counsel for Appellant Angel B.*

Czop Law Firm PLLC, Higley
By Steven Czop
*Counsel for Appellant Osanna B.*

John L. Popilek PC, Scottsdale
By John L. Popilek
*Guardian Ad Litem for Appellees A.B. and R.B.*

---

## MEMORANDUM DECISION

Presiding Judge Andrew W. Gould delivered the decision of the Court, in which Chief Judge Michael J. Brown and Judge Kenton D. Jones joined.

---

**G O U L D**, Judge:

¶1   Osanna B. ("Mother") and Angel B. ("Father") appeal from the juvenile court's order terminating their parental rights. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2   Mother and Father are the parents of A.B., who was born in August 2003, and R.B., who was born in November 2007. On April 7, 2011, A.B. told officials at his school that R.B. was crying a lot because Mother and Father were hitting him. A case manager from the Department of Child Safety ("DCS") was assigned to investigate the report. A.B. told the case manager that R.B. has "scratches and bruises all over him" due to Mother hitting him, and that Father was present when Mother hit R.B. When the case manager observed R.B. a few days later, she saw no bruises or injuries; however, she did note the parents imposed harsh discipline on R.B., including spankings and withholding food as a form of punishment. Additionally, the case manager reported that A.B. was expressing severe anxiety about how R.B. was being treated by his parents.

¶3   On April 19, 2011, while Father and A.B. were away from the home, Mother called Father "screaming and yelling" that R.B. had been using the restroom and had collapsed on the floor. Mother claimed that

R.B. was unconscious when she found him. Although she was trained in CPR, Mother stated she was too upset to use it; instead, she attempted to revive R.B. by hitting his back and chest. Father called 9-1-1 and paramedics transported R.B. to the hospital, where he nearly died due to a life threatening brain injury. The attending physician later determined the brain injury was caused by "non-accidental trauma." Mother and Father were arrested for child abuse; however, charges were later dropped against Father. Mother eventually pled guilty to child abuse and was placed on probation for 20 years. *See* Ariz. Rev. Stat. ("A.R.S.") § 13-3623(B)(1) (knowingly inflicting physical injury on a child under 15).

¶4 The juvenile court found the children dependent as to both parents. DCS subsequently filed petitions to terminate the parents' rights on the grounds of abuse, neglect, Mother's conviction for child abuse, and fifteen months' time-in-care. *See* A.R.S. § 8-533(B)(2) (abuse and neglect); A.R.S. § 8-533(B)(4) (conviction of a felony showing unfitness to parent); A.R.S. § 8-533(B)(8)(c) (fifteen months' time-in-care).

¶5 The court held a contested severance hearing. Following the hearing, the court terminated Mother and Father's rights based on all of the statutory grounds alleged by DCS. The court also determined that termination was in the best interests of the children. Mother and Father timely appealed.

**DISCUSSION**

¶6 Mother and Father argue there is insufficient evidence supporting termination. Both parents also assert termination was not in A.B.'s best interests.[1]

---

[1] Mother also argues that in terminating their parental rights, the court improperly relied on the findings made by a prior judge at the dependency hearing. We disagree. A court may base a termination decision on evidence obtained in a dependency hearing so long as it applies the correct burden of proof, clear and convincing evidence, to the evidence. *See Pima Cty. Juv. Action No. S-114487*, 179 Ariz. 86, 93 (1994) (court properly admitted transcripts of testimony from a dependency hearing in a termination hearing; the court correctly applied the higher, clear and convincing standard of proof when making its termination findings).

¶7        To terminate the parent-child relationship, the court's findings must be based on clear and convincing evidence.  A.R.S. § 8–537(B) (2014); *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002).  "[W]e will accept the juvenile court's findings of fact unless no reasonable evidence supports those findings, and we will affirm a severance order unless it is clearly erroneous."  *Id.*  As the trier of fact in a termination proceeding, the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M.*, 203 Ariz. at 280, ¶ 4.  Finally, if the evidence supports termination on any one ground, we need not consider challenges as to other grounds. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 27 (2000).

## I.        Termination Based on Abuse

¶8        A.R.S section 8-533(B)(2) provides for termination when a "parent has . . . willfully abused a child."  Such abuse "includes serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child."  A.R.S. § 8-533(B)(2) (West 2016).

### A.        R.B.

¶9        The court's finding that Mother willfully abused R.B. is supported by substantial evidence.  While R.B. was alone with Mother on April 19, 2011, he sustained "life-threatening" injuries, including a large subdural hematoma, which bled so severely that a neurosurgeon had to perform an immediate craniectomy to remove a piece of his skull and drain the excess blood.  Imaging tests revealed that R.B. had "old blood" on his brain, indicating he had suffered a previous brain injury.  Additional tests showed that R.B. had a lacerated liver, which Dr. Zimmerman estimated to have occurred three to four days prior to the subject brain injury, and a healing rib fracture that was inflicted 10-14 days prior to R.B.'s hospitalization.  Dr. Zimmerman further testified that R.B. had a skull fracture, and that she noticed several bruises and abrasions on his body.

¶10       Dr. Zimmerman opined that R.B.'s injuries were not, as Mother contended, the result of him falling off a toilet.  Rather, she testified that in her opinion, R.B.'s injuries were caused by abuse.  She testified that the types of force required to cause R.B.'s subdural hematoma included falling "from a two-story building," being in a car accident, or having one's head slammed into a wall.

¶11 Many of R.B.'s other injuries were older, and occurred days and weeks before his head injury; in short, they could not have been caused by Mother's claim R.B. fell off the toilet. Additionally, these older injuries were not consistent with Mother's story that R.B. fell from the toilet. For example, R.B. had a liver laceration most likely caused by "some sort of direct impact blow type trauma."

¶12 Substantial evidence also shows that Father knew, or reasonably should have known that Mother was abusing R.B., and that he failed to protect R.B. from her abuse. A.B. disclosed to Dr. Moe, a psychologist, that both Father and Mother hit, punched and hurt R.B.. A.B.'s therapist, Kristi Murphy, also testified that A.B. had demonstrated how on one occasion Father had slammed R.B.'s head on the toilet. Finally, the court found that A.B.'s statements "that both [F]ather and [M]other have physically abused his brother [R.B.] in his presence . . . were credible."

**B.      A.B.**

¶13 The record shows that A.B. suffered severe emotional harm caused by the abusive environment in the parents' home. Dr. Moe diagnosed A.B. with post-traumatic stress disorder (PTSD), which he described as "a discord that is created when an individual is exposed to significant trauma." He opined that A.B.'s PTSD was related to his anxiety regarding the abuse R.B. suffered. Dr. Moe concluded that Father's and Mother's treatment of R.B. constituted emotional abuse of A.B..

¶14 A.B.'s therapist, Murphy, concurred with Dr. Moe, concluding that A.B. suffered from PTSD. Murphy also noted that A.B. frequently "express[ed] fear, a fear of his mom and dad and fear that he and/or [R.B.] would get hurt again."

¶15 Accordingly, we affirm the court's termination of Mother and Father's parental rights on the grounds of abuse.

**II.      Best Interests**

¶16 Mother and Father also contend there was insufficient evidence showing that severance was in the best interests of the children.

¶17 "To prove that the termination of parental rights would be in a child's best interests, [DCS] must present credible evidence demonstrating 'how the child would benefit from a severance *or* be harmed by the continuation of the relationship.'" *Lawrence R. v. Ariz. Dep't of Econ. Sec.*, 217 Ariz. 585, 587, ¶ 8 (App. 2008) (quoting *Mary Lou C. v. Ariz. Dep't*

*of Econ. Sec.*, 207 Ariz. 43, 50, ¶ 19 (App. 2004)).  Evidence showing a child is adoptable is sufficient to satisfy a finding that the child would benefit from the termination of parental rights.  *Maricopa Cty. Juv. Action No. JS–501904*, 180 Ariz. 348, 352 (App. 1994).  In addition, the juvenile court may also consider whether the child's existing placement is meeting the child's needs.  *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5 (App. 1998).

**¶18**　　　　The record supports the court's best interest findings.  A.B. has lived with his current placement for four-and-a-half years, and they are willing to adopt him.  They are working with A.B. regarding his PTSD issues, and providing for his needs, both physically and emotionally.

**¶19**　　　　R.B. is in the home he lived in prior to being adopted by Mother and Father.  Although R.B. has special needs, his current placement is providing for these needs.  They, too, are considering adopting R.B., but he is also adoptable even if his current placement is unable to do so.  Moreover, although living in different homes, the current placements for both children are committed to ensuring that the boys maintain their relationship.

**¶20**　　　　Given Mother's severe physical and emotional abuse of both children, it is clear they would be harmed by continuing their relationship with Mother.  In addition, the children would be at risk of abuse if they were returned to Father.  Father continues to deny that Mother intentionally caused R.B.'s head injury.  This denial has led to significant concerns about whether the children would be safe in his care.  Indeed, Father has indicated that he wants the children returned to both parents, including Mother, notwithstanding the life-threatening injuries R.B. sustained while in her care.

**¶21**　　　　Thus, we conclude the evidence supports the court's findings that severance was in the best interest of the children.

**CONCLUSION**

**¶22** For the reasons above, we affirm the court's termination of Mother and Father's parental rights to the children.



Amy M. Wood • Clerk of the court
FILED: AA